## CONTINUATION OF COMPLAINT

I, Jeremiah Gauthier, being duly sworn, hereby depose and state as follows:

### INTRODUCTION AND BACKGROUND

1.  I make this continuation of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of two cellular telephones, described in Attachment A, that are currently in the possession of law enforcement, and the extraction of electronically stored information from that property, as described in Attachment B.

2.  I am a Task Force Officer with the Drug Enforcement Administration and have experience in the investigation, apprehension and prosecution of individuals involved in federal criminal offenses. I have been so employed since November 2017. I have been employed for ten years as a deputy sheriff and have been a task force officer for a multi-jurisdictional narcotics task force, the Southwest Enforcement Team ("SWET"), since March 2014. I have been involved in multiple investigations while with the DEA and involved in hundreds of drug-related investigations in and around southwest Michigan while with SWET. I am currently assigned to the Kalamazoo, Michigan, Post of Duty where I am involved in investigations regarding the illegal manufacturing, distribution, transportation, and sales of drugs, as well as the investigation of money-laundering methods used by drug traffickers. I have participated in numerous search warrants, interviews, investigations, and trainings related to federal crimes.

3.      I have received training in the area of narcotics investigations, money

laundering, financial investigations, and various methods, which drug dealers use in an effort to conceal and launder the proceeds of their illicit drug-trafficking enterprises. I have participated in numerous investigations involving violations of narcotics laws. I have participated in investigations that have led to the issuance of search warrants involving violations of narcotic laws. These warrants involved the search of locations including: residences of targets, their associates, and relatives; storage facilities; smartphones; and computers. Evidence searched for, and recovered, in these locations has included controlled substances, records pertaining to the expenditures and profits realized therefrom, monetary instruments, and various assets that were purchased with the proceeds of the drug trafficking.

4. The facts in this Continuation come from my personal observations, training, experience, and information obtained from other agents and witnesses. This Continuation is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. This continuation is submitted for the purpose of obtaining a search warrant for two cellular telephones seized during the investigation of WILBERT JAMES SMITH for possession with intent to distribute heroin, in violation of Title 21, United States Code, Sections 841(a)(1); possession of a firearm in the furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c); and possession of a firearm by a felon, in violation of Title 18, United States Code, Section 922(g). This continuation contains only a summary of relevant facts. I have not included each and every fact known to me concerning the entities, individuals, and

events described in this continuation

## PROBABLE CAUSE

*<u>Police Find Heroin, a Handgun, and Two Cell Phones in Smith's Car.</u>*

6.  This continuation is based on a DEA and Michigan State Police (MSP) investigation.

7.  On Friday December 4, 2020, MSP obtained a License Plate Reader (LPR) hit on a 2018 Chevrolet Malibu bearing Michigan license plate number EGT1246. The hit indicated the vehicle was involved in a felony out of Detroit Police Department and the occupants were considered armed and dangerous. MSP located the vehicle and initiated a traffic stop on the Malibu. The stop occurred in New Buffalo Township, Michigan, which is located within the Western District of Michigan. When MSP made contact with the driver, he identified himself as WILBERT JAMES SMITH. SMITH was the sole occupant of the vehicle at the time of the traffic stop. MSP Motor Carrier Officer (MCO) Justin Van Nuil, made contact with dispatch regarding SMITH and was informed that SMITH was driving on a suspended Michigan license and multiple arrest warrants. Based on the hit, suspended license, and warrants, MSP arrested SMITH and conducted an inventory search of the vehicle.

8.  During the search of the Malibu, MSP discovered a Glock 19, 9mm handgun. The handgun was fully loaded with a 24 round magazine and one round in the chamber. Also, discovered was plastic grocery bag which contained an oval shaped package wrapped in green plastic wrap, which weighed approximately 445.16

grams. A smaller package wrapped in the same type of green plastic wrap, which weighed approximately 5.58 grams, was also discovered in the grocery bag. The Glock handgun and the two packages of suspected controlled substance were all located next to each other under the driver's seat of the Malibu.

9. MCO Van Nuil further located a wallet in the center console of the Malibu and located SMITH's Michigan driver's license inside the wallet. Furthermore, SMITH was the registered owner of the Malibu at the time of the traffic stop.

10. MCO Van Nuil also found two cellular telephones inside the vehicle. One was an Alcatel flip phone, black in color (evidence #5 from Incident No: 053-0004994-20). The other was a black Apple iPhone (evidence #6 from Incident No: 053-0004994-20).

11. After the suspected controlled substance, handgun, and cell phones were located MCO Van Nuil interviewed SMITH after being advised of his Miranda Rights. During the interview, SMITH indicated he knew there was a handgun under the front seat, but he had not bothered to move it in order to transport it properly. SMITH also stated he did not have a Michigan Concealed Pistol License at the time. SMITH was further asked about the packages also located under the front seat and SMITH indicated that he knew they were there, but nothing further. SMITH was also interviewed by Southwest Enforcement Team (SWET) Detective Lt. Shawn Yech and he (SMITH) admitted he was paid to drive to Chicago to pick up the packages and drive them back to Detroit.

12. Lt. Yech seized both of the packages of the controlled substance and the handgun, which were all transported to the SWET office. Lt. Yech opened the larger of the two packages and discovered it to be a brown powdery substance. Lt. Yech then opened the smaller package and discovered a solid black substance. A small amount of the substances from both packages were field tested and both showed a positive hit for the presence of heroin.

13. SMITH was lodged at the Berrien County Jail for the handgun controlled substance violations.

### SMITH is a Convicted Felon.

14. SMITH is a convicted felon for Financial Transaction Device – Possession of Fraudulent One, in violation of State of Michigan Code MCL 750.157N2. He was convicted of this offense in Michigan's 17th Circuit Court in 2016.

### SMITH was Likely Transporting Heroin for Distribution.

15. In my training and experience, the quantity of drugs discovered is far more than a user quantity of heroin, which is often sold to users in doses of one tenth (0.1) of a gram. I also know from my training and experience that drug traffickers often keep loaded weapons on hand when transporting dealer-quantities of narcotics in order to protect their product from other criminals who might try to steal it. I have further learned from my training and experience that, in the case of a gunfight over drugs, high-capacity magazines can provide an advantage over adversaries who are using only standard-issue magazines. This is because high-capacity magazines allow shooters to fire more rounds without having to pause for reloading.

16. Here, police recovered a loaded Glock19 with a high-capacity magazine located next to a package of narcotics that contained more than 4,000 street-level doses of one tenth (0.1) of a gram. This drug quantity and the proximity of the loaded handgun with a high-capacity magazine, suggest that the drugs were intended for distribution, and that the gun was on hand to protect the drugs during transport.

*The Phones from SMITH's Car Likely Contain Evidence.*

17. My training, experience, and participation in drug investigations has made me aware of the following matters concerning illegal drug trafficking and cellular telephone devices:

   a. Drug traffickers often keep names, aliases, and/or contact information of suppliers, purchasers, and others involved in drug trafficking in their devices;

   b. Drug traffickers sometimes use electronic messaging or messaging apps, in addition to MMS, SMS text messages, and voice call, to communicate with suppliers, purchasers, and others involved in drug trafficking on their devices;

   c. Drug traffickers often take pictures or videos of their drug trafficking associates, drugs, money and/or firearms, which they store on their devices;

   d. Drug traffickers often maintain multiple phones in order to disperse the information about their drug contacts across multiple electronic devices; they often use separate devices to

        contact suppliers, customers, and associates respectively; the contact history, call logs, and text messages in multiple devices typically show the complete picture of a drug traffickers illegal activities. Drug traffickers often keep multiple devices close at hand, even when traveling outside their homes, in order to remain consistently available for communication with suppliers, associates and customers. Drug traffickers will often use flip phones or "burner" phones which can easily be discarded, switched out or replaced in order to evade law enforcement.

d.    Global Position System (GPS) data on phones may show the location of a drug trafficker at a given time, which may provide corroborating evidence of a drug delivery or other instance of drug trafficking;

h.    It is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and or expenditure of drug proceeds. This evidence includes electronic records of financial transactions, which are often stored on mobile phones and computers. Drug traffickers often use services such as Western Union, Moneygram, Venmo, CashApp and others in order to disguise and/or launder their narcotics proceeds and expenditures. The services can be downloaded onto mobile phone and computing devices in the form

        of apps. These services can be used to wire money to sources of supply, distributors, and co-conspirators day and night from the devices with anonymity. However, when downloaded to a phone, these applications often contain records that chronicle transactions performed on that device.

    q.    Drug traffickers often use social networking applications such as Facebook and Facebook Messenger to shop for and purchase firearms and ammunition so that they can have weapons on hand to protect their drug supplies and drug proceeds.

    r.    Drug traffickers often take digital photographs of guns, money, and drugs and store these photographs on their phones. Sometimes, drug traffickers send these photographs to others in order to demonstrate the quality and quantity of illegal merchandise that they are willing to sell. Sometimes, drug traffickers use these photographs to flaunt their status as successful dealers to acquaintances, friends, and competitors on social media or through social networking applications.

### *SMITH Consents to a Phone Search After Being Charged by Complaint.*

18.    Based in part on the above facts, a federal magistrate in the Western District of Michigan issued an arrest warrant and a writ of habeas corpus ad prosequendum on December 8, 2020 (Case Number 1:20-MJ-522). The complaint alleged that SMITH had committed three offenses: (1) possession of heroin with

intent to distribute, contrary to 21 U.S.C. § 841(a)(1), (2) possession of a firearm in furtherance of a drug trafficking crime, contrary to 18 U.S.C. § 924(c), and (3) possession of a firearm by a felon, contrary to 18 U.S.C. § 922(g)(1).

19. On December 9, I went to the Berrien County Jail, where SMITH was lodged, and informed him of the charges and his pending appearance before a federal magistrate in the Western District of Michigan. I asked SMITH for permission to search the cell phones recovered from his vehicle. SMITH confirmed that the phones belonged to him, and he gave me permission to search the phones.

20. I am advised by the United States Attorney's Office for the Western District of Michigan that the Sixth Amendment affords defendants the right to counsel, and that once this right attaches, direct communication with a defendant about the subject matter of a pending matter, without prior coordination through defense counsel, is not proper. I am also advised by the United States Attorney's Office for the Western District of Michigan, that the Sixth Circuit has not articulated whether the Sixth Amendment right to counsel automatically attaches upon the filing of a criminal complaint, prior to a defendant's initial appearance or arraignment. Some federal circuits have held that the right to counsel does *not* attach in these circumstances. *E.g.*, *United States v. Moore*, 670 F.3d 222, 234 (2d Cir. 2012) ("arrest on a warrant, even one issued pursuant to a criminal complaint sworn out by prosecutors, is insufficient [for right to attach] prior to the initial appearance before a judicial officer"). The Eighth Circuit has taken the opposite position, concluding that the "right to counsel attaches to interrogations conducted after the initiation of

adversarial criminal proceedings against the defendant; it is of no import whether the proceedings were initiated by complaint or indictment." *Manning v. Bowersox*, 310 F.3d 571, 575 (8th Cir. 2002).

21. In view of this conflicting caselaw, I am seeking a warrant for the search of the phones from SMITH's car in order to secure an independent legal basis, apart from SMITH's consent, for the search of these phones.

22. None of the information contained in this affidavit was obtained from a search of the phones in question.

23. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

24. Based on the forgoing information, I submit there is probable cause to believe that WILBERT JAMES SMITH has violated Title 21, United States Code, Sections 841(a)(1); Title 18, United States Code, Section 924(c); and Section 922(g). I further submit there is probable cause for a search warrant authorizing the examination of the phones described in Attachment A to seek the items described in Attachment B.